## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAAIYAH SHABAZZ, et al.,** | : | **Civil No. 1:17-CV-445** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **COLONIAL PARK CARE CENTER** | : | |
| **LLC d/b/a COLONIAL PARK CARE** | : | |
| **CENTER, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM AND ORDER

### I. Factual and Procedural Background

On March 1, 2017, the plaintiffs filed this Fair Labor Standards Act (FLSA) collective action brought on behalf of Certified Nursing Assistants employed by the defendants at some 12 facilities. (Doc. 1). In their complaint the plaintiffs brought two wage-and-hour law violations. First, the plaintiffs alleged that Colonial Park failed to properly calculate the regular rate of pay for CNAs. Specifically, in addition to a base hourly rate, the plaintiff and class members often earned shift differential wages. However, it was alleged that Colonial Park often paid employees an overtime rate of just one and one-half times their base hourly rates rather than one and one-half times their regular rates, which was often a higher rate of pay. Second, it was

1

alleged that Defendant unlawfully rounded time clock punches. According to the complaint, this practice of rounding the time at which employees punched the time clock to the nearest quarter-hour resulted in employees working unpaid overtime hours before and after their shifts in violation of the law.

The defendants have denied these allegations. Nonetheless over the past several years, the parties have engaged in informal discovery and extensive settlement discussion. We have worked closely with counsel addressing these issues and facilitating their settlement discussions. In the course of overseeing this litigation, we have been struck by the high level of skill, sophistication, talent, and tenacity displayed by all counsel. Ultimately, those arms-length negotiations culminated with the parties' agreement on the terms of a proposed collective settlement. The parties then consented to magistrate judge jurisdiction, (Doc. 77), and submitted their proposed settlement agreement to the court for its approval, as required by the FLSA. (Doc. 78-2). We then entered a preliminary approval order relating to this settlement and scheduled a final approval hearing for October 19, 2021. (Doc. 79).

This settlement agreement is embodied in an 18-page document consisting of the proposed agreement and attachments. In pertinent part, the agreement provides for the creation of a total settlement fund of $175,000. (Id.) From this sum, $58,333.33, approximately 33 1/3% or 1/3 of the total sum, is set aside for attorneys'

fees. The agreement also provides for reimbursement of the attorneys' out of pocket costs to date, which are minimal, approximately $802.00. In addition, pursuant to this agreement, the court appointed CAC Services Group, LLC, as the claims administrator in this case for purposes of providing notice and distribution of these settlement funds to this collective, which included more than 3,400 potential members and provided for payment of CAC's reasonable fees, which reportedly total approximately $21,354.02. Once these fees and expenses are deducted, there remains more than $89,000.00 for distribution to members of the collective, and the settlement agreement designated $5,000.00 as a service payment allocation for the lead plaintiff in this case whose role in the litigation warrants service award payments. (Id.) The agreement then prescribed a formula for the distribution of these remaining funds to collective members.

We now have before us an unopposed motion for final approval of this settlement. (Doc. 83). In this motion it is represented that the settlement administrator sent the Notice of Class and Collective Action Settlement ("Notice") to 3,409 class members. The Notice described the terms and conditions of the settlement, explained how class members may opt into the collective action, object to the settlement, and how they may opt out of the Rule 23 class action. To date, the results of this notice process have been singularly positive. It is reported that only one class member has opted out and 516 individuals submitted consent

3

forms to join the collective action. Furthermore, not a single class member has objected to the settlement, including its fees, costs, and distribution methods.

Upon consideration of the agreement and the parties' supplemental submissions, and the matters presented at this final approval hearing, this settlement is approved as a fair, reasonable, and adequate resolution of this complex and protracted FLSA collective action.

## II. <u>Discussion</u>

It is axiomatic that courts favor the settlement of disputed claims. In the context of litigation under the Fair Labor Standards Act, as a general rule, "[t]here are only two ways that FLSA claims may be compromised or settled: (1) a compromise supervised by the Department of Labor pursuant to 29 U.S.C. § 216(c), or (2) a compromise approved by the district court pursuant to 29 U.S.C. § 216(b)." <u>Kraus v. PA Fit II, LLC</u>, 155 F. Supp. 3d 516, 522 (E.D. Pa. 2016). In conducting its review of a proposed FLSA settlement, the court should determine whether the agreement constitutes a resolution of a bona fide workplace dispute. The court "next conducts a two-part fairness inquiry to ensure that (1) the settlement is fair and reasonable for the employees, and (2) the settlement furthers the FLSA's implementation in the workplace." <u>Altnor v. Preferred Freezer Servs., Inc.</u>, 197 F. Supp. 3d 746, 764 (E.D. Pa. 2016) (citations omitted).

4

Moreover, "[i]n this Circuit, a settlement is entitled to an initial presumption of fairness where it resulted from arm's-length negotiations between experienced counsel . . . ." Galt v. Eagleville Hosp., 310 F. Supp. 3d 483, 493 (E.D. Pa. 2018). However, in evaluating whether that presumption applies, we are enjoined to consider a multi-factor test that examines the sufficiency of the settlement terms, the costs, risks, and complexity of the litigation, elements of litigative risk, as well as the enforceability of any judgments that might be obtained through protracted litigation. Id. (citing Girsh v. Jepson, 521 F.2d 153 (3d Cir. 1975)). Specifically, we are enjoined to consider the following factors when assessing the fairness of a proposed settlement:

> (1) the complexity, expense and likely duration of the litigation . . . ; (2) the reaction of the class to the settlement . . . ; (3) the stage of the proceedings and the amount of discovery completed . . . ; (4) the risks of establishing liability . . . ; (5) the risks of establishing damages . . . ; (6) the risks of maintaining the class action through the trial . . . ; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery . . . ; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

Girsh v. Jepson, 521 F.2d 153, 157 (3d Cir. 1975).

Guided by these principles, we find that the proposed settlement in this case is fair, reasonable, and adequate. In reaching this conclusion, we note at the outset that the proposed agreement resolves what is plainly a bona fide workplace dispute. Indeed, the issues presented in this lawsuit concerning wage and overtime

5

calculation lie at the heart of the protections afforded to workers by the FLSA. We further conclude "that (1) the settlement is fair and reasonable for the employees, and (2) the settlement furthers the FLSA's implementation in the workplace." Altnor, 197 F. Supp. 3d at 764.

This finding is based upon our own independent assessment of the factors prescribed by the Third Circuit in Girsh. At the outset, we find that the complexity, expense, and likely duration of this litigation strongly favor settlement of this lawsuit. To date, the parties have engaged in nearly four years of preliminary proceedings and settlement discussions. Further, absent a settlement, and with the past as a predictor of the future, we anticipate that merits litigation moving forward would be protracted in its scope and duration.

As for the second Girsh factor, the collective member's reaction to the litigation, it is evident that the lawsuit, and hence its successful settlement, appear to enjoy broad support. This consideration also augurs in favor of approval of the settlement.

The third Girsh factor, the stage of these proceedings, also heavily in favor of approval of this settlement. This factor " 'captures the degree of case development that class counsel [had] accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating.'" In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 537

6

(3d Cir. 2004). In this case, we find that the parties have engaged in protracted arms-length negotiations of this dispute following a period of informal discovery. Plaintiffs' counsel attests that the informal exchanges conducted by the parties have enabled all parties to engage in their settlement negotiations in a fully informed fashion, weighing the risks and rewards of litigation based upon a complete understanding of the complex factual backdrop to this lawsuit. We "conclude[] that class counsel adequately appreciated the merits of the case before negotiating," id., and find that this factor also favors settlement of this dispute.

Girsh and its progeny also caution us to consider litigative risk in evaluating the reasonableness of an FLSA collective action settlement, specifically enjoining us to take into account "the risks of establishing liability; [] the risks of establishing damages; [and] the risks of maintaining the class action through the trial." Girsh, 521 F.2d at 157. While such predictive judgments are often difficult to make with any certainty, suffice it to say that the plaintiffs' claims which would have entailed examination of time keeping and wage practices at 12 different facilities operated by the defendants, could have faced significant legal and factual challenges at trial. Indeed, the plaintiffs estimate that this $175,000 settlement represents around 85% of the allegedly owed overtime wages in this case (i.e., $203,000) and around 43% of the total amount of damages conceivably recoverable in this matter (i.e., $406,000). Thus, compromise and settlement of this claim represents a substantial

recovery for the plaintiffs and was a prudent course on behalf of all parties given the costs and uncertainty of protracted litigation.

Further, when we consider the final <u>Girsh</u> factors, the range of reasonableness of the settlement fund in light of possible recoveries and risks of litigation, we are fully satisfied that this settlement is a very fair and reasonable outcome for all parties.

Having made these findings, we must ascertain whether the settlement furthers or frustrates the FLSA's implementation in the workplace. <u>Altnor</u>, 197 F. Supp. 3d at 764. On this score, we conclude that "[f]ar from frustrating FLSA, the settlement actually furthers it." <u>Creed</u>, 2013 WL 5276109, at *4. Therefore, the broader policy goals of pay equity in the workplace that the FLSA was enacted to address are fully vindicated through this settlement.

Having addressed these broad concerns and found that the settlement agreement satisfies the core requirements prescribed by the FLSA, we have also considered several more specific aspects of this proposed settlement. At the outset, we have examined the incentive award provision of the agreement and conclude that the proposed service award allocation of $5,000 to the named plaintiff is appropriate. Incentive payments play an important role in FLSA litigation. These payments recognize the potential hardships that lead plaintiffs may face in FLSA lawsuits and appropriately compensate those plaintiffs for their lead role in vindicating the rights of others. Given the substantial goals that such payments advance:

8

> Factors to consider when assessing incentive awards are: (a) the risk to the plaintiff in commencing suit, both financially and otherwise; (b) the notoriety and/or personal difficulties encountered by the representative plaintiff; (c) the extent of the plaintiffs personal involvement in the suit in terms of discovery responsibilities and/or testimony at depositions or trial; (d) the duration of the litigation; and (e) the plaintiffs personal benefit (or lack thereof) purely in his capacity as a member of the class. Godshall v. Franklin Mint Co., 2004 WL 2745890, at *6 (E.D.Pa.2004) (citing In re Plastic Tableware Antitrust Litig., 1995 WL 723175, at *2 (E.D.Pa.1995)). This is not a formal test, but merely represents some of "the reasons courts cite for approving such awards." In re U.S. Bioscience Sec. Litig., 155 F.R.D. 116, 121 (E.D.Pa.1994).

Creed, 2013 WL 5276109, at *7. In the instant case, considering the protracted nature of this litigation, the commitment of time and effort that the litigation demanded of the lead plaintiff and the potential reputational risks involved, we find that this $5,000 incentive award is fair, reasonable, and consistent with awards previously approved in other, similar cases. Id. (approving $15,000 incentive award); Perry v. FleetBoston Fin. Corp., 229 F.R.D. 105, 118 (E.D. Pa. 2005) (approving $5,000 incentive awards where plaintiffs expended "significant time and resources" for a litigation that had been pending for "over a year").

We also believe that the release language of the settlement agreement is narrowly tailored in a fashion that is appropriate to this case, and thus avoids one of the issues which have concerned courts in the past, release provisions that are "inappropriately comprehensive." Bettger v. Crossmark, Inc., No. 1:13-CV-2030, 2015 WL 279754, at *9 (M.D. Pa. Jan. 22, 2015). The release provision in this settlement agreement is specifically tied to the plaintiffs' FLSA claims and their state

law analogues. Since the release is closely tied to the claims set forth in the complaint, it avoids the dangers cited by courts when confronted with global releases and the release provision of the agreement is also approved.

Finally, we have also carefully evaluated the attorneys' fees component of this proposed settlement. As we have noted, the proposed settlement creates a total settlement fund of $175,000. Under the terms of the agreement, plaintiffs' counsel, who have taken the lead over the past four years in pursuing this FLSA action, are to receive attorneys' fees of $58,333.33. This constitutes an attorneys' fee payment of approximately 33 1/3% or 1/3 of the total fund. However, according to affidavits submitted in support of this motion seeking approval of the settlement agreement, this negotiated attorneys' fee award is a significant reduction below the actual fees incurred in the prosecution of this case. Moreover, and notably, there has been no objection to this fee award by any members of the collective group represented by counsel in this case.

In cases of this type, which involve the creation of a common fund for the benefit of others, courts often rely upon a percentage of recovery analysis when assessing the reasonableness of a fee award. As this court has observed:

> The percentage of recovery method is generally preferred under the common fund doctrine. Keller, 2014 WL 5591033, at *14 (citing In re Prudential, 148 F.3d at 333). Under the common fund doctrine, "a private plaintiff, or plaintiff's attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a claim, is entitled to recover from the fund the costs of his litigation, including attorneys'

fees." Cendant II, 404 F.3d at 187 (quoting In re Gen. Motors, 55 F.3d at 820 n. 20). "Further, the percentage of recovery method is the prevailing methodology used by courts in the Third Circuit for wage and hour cases." Keller, 2014 WL 5591033, at *14; see also DiClemente v. Adams Outdoor Adver., Inc., No. 3:15-0596, 2016 WL 3654462, *4 (M.D. Pa. July 8, 2016) (same)."[C]ourts have approved attorneys' fees in FLSA [collective and class action] settlement agreements 'from roughly 20-45%' of the settlement fund." Kraus, 155 F. Supp. 3d at 534 (quoting Mabry v. Hildebrant, No. 14-5525, 2015 WL 5025810, at *4 (E.D. Pa. Aug. 24, 2014) (collecting cases)).

Acevedo v. Brightview Landscapes, LLC, No. CV 3:13-2529, 2017 WL 4354809, at *16 (M.D. Pa. Oct. 2, 2017). When applying the common fund percentage of recovery method to evaluation of a fees award, we should consider:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000). We exercise considerable discretion in making these judgments and are cautioned to refrain from employing these factors in any rigid formulaic fashion. Id.

In this case the factors we are urged to consider when evaluating the attorneys' fees component of an FLSA settlement, on balance, favor approval of this attorneys' fee award. At the outset, we note that the proposed attorneys' fee payment of approximately 33 1/3% or 1/3 of the total fund falls within the percentage range of fees that have been approved in the past as reasonable—20% to 45%—albeit at the

11

higher end of this range. In our view, however, a fees award at the mid-range of those fees previously found reasonable is appropriate in this case given the complexity of the ligation, the protracted nature of the lawsuit, the amount of time devoted by counsel to this litigation, and the high level of skill and tenacity displayed by counsel.

We are also persuaded of the reasonableness of this proposed fee award when we consider that this negotiated attorneys' fee award is a significant reduction below the actual lodestar fees claimed to be incurred in the prosecution of this case, as reported by counsel in the affidavits filed with this court—fees which would have potentially amounted to $67,500 or more. In this regard, when evaluating the fees component of an FLSA settlement:

> The Third Circuit has stated that "it is 'sensible' for district courts to 'cross-check' the percentage fee award against the 'lodestar' method." In re Rite Aid Corp., 396 F.3d at 305 (citing In re Prudential, 148 F.3d at 333). The lodestar crosscheck is performed by calculating the "lodestar multiplier," which is determined by dividing the requested fee award by the lodestar. In re AT & T Corp., 455 F.3d 160, 164 (3d Cir.2006). To determine the lodestar method's suggested total, the court multiplies "the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services." In re Rite Aid Corp., 396 F.3d at 305.

Altnor, 197 F. Supp. 3d at 766. In this case, when we perform this lodestar multiplier cross check, the multiplier falls well below a factor of 1, and is only approximately .86. In this regard, it is well settled that " '[a] lodestar multiplier of less than one,' like the lodestar multiplier here, 'reveals that the fee request constitutes only a fraction of the work that the attorneys billed' and thus favors approval." Id. at 767.

Therefore, this cross-check analysis further confirms the reasonableness of the fees award negotiated here and favors approval of that award. Further, the $802 in costs incurred here are modest, proportionate to the complexity of the case, and are also approved.

Further, the payment of $21,354.02 to the claims administrator, CAC, which will be responsible for overseeing the logistics of notice, communication, and disbursement of funds to this collective, which may total more than 3,400 people, is both reasonable and appropriate. Therefore,"[i]n the absence of any objections from class members, the Court finds the requested payment to be fair and reasonable in light of the efforts expended." Galt v. Eagleville Hosp., 310 F. Supp. 3d 483, 499 (E.D. Pa. 2018) (approving $8,000 fee for claims administration in a case involving less than 400 putative claimants).

Finally, the designation of a cy pres recipient for any unclaimed residual funds is "appropriate if a settlement contains sufficient direct benefit to the class." In re Nat. Football League Players' Concussion Inj. Litig., 307 F.R.D. 351, 418 (E.D. Pa. 2015), amended sub nom. In re Nat'l Football League Players' Concussion Inj. Litig., No. 2:12-MD-02323-AB, 2015 WL 12827803 (E.D. Pa. May 8, 2015), and aff'd sub nom. In re Nat'l Football League Players Concussion Inj. Litig., 821 F.3d 410 (3d Cir. 2016), as amended (May 2, 2016). This settlement provides direct benefits to

the class and this cy pres designation provides an efficient way to distribute any residual unclaimed funds.

Therefore, finding: (1) that the terms of this settlement that resulted from an arms-length negotiation are fair, reasonable, and adequate as between the parties; and (2) that the purposes of the FLSA are fully satisfied through the proposed resolution of this specific case, the settlement agreement will be approved.

An appropriate order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DAAIYAH SHABAZZ, et al.,** | : | **Civil No. 1:17-CV-445** |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **COLONIAL PARK CARE CENTER** | : | |
| **LLC d/b/a COLONIAL PARK CARE** | : | |
| **CENTER, et al.,** | : | |
| | : | |
| **Defendants** | : | |

## <u>ORDER</u>

AND NOW this 19th day of October 2021, this matter came before the Court upon Plaintiffs' Unopposed Motion for Final Approval of Settlement of Collective Action. (Doc. 83). Having reviewed the Motion and all accompanying papers, and the Court being otherwise fully advised, it is ORDERED AND ADJUDGED as follows: The Plaintiffs' Motion (Doc. 83) is GRANTED. The Court finds that the Parties' Settlement in this Fair Labor Standards Act lawsuit is fair, reasonable, and just. The Court further finds that the $175,000 payment contemplated by this settlement has previously been made and those funds are being held in escrow for

disbursement in accordance with the settlement agreement and this order approving that agreement. Accordingly, IT IS:

1. ORDERED that having adjudged the terms of the Parties' Settlement Agreement to be fair, reasonable, and adequate, the Settlement Agreement is given final approval by this Court;

2. ORDERED that the preliminarily certified class action for Named Plaintiff's claim under the Pennsylvania Minimum Wage Act is granted final certification pursuant to Rule 23(a) and 23(b)(3);

3. ORDERED that the preliminarily certified FLSA collective action is granted final certification;

4. ORDERED that the Claims Administrator shall distribute the Settlement Payment from the escrowed funds previously paid by the defendant pursuant to the Settlement Agreement;

5. ORDERED that Class Counsel's fee application for reasonable attorney's fees in the amount of $58,333.33 from the escrowed funds previously paid by the defendant is approved;

6. ORDERED that Class Counsel's application for reasonable costs in the amount of $802 from the escrowed funds previously paid by the defendant is approved;

7. ORDERED that the requested service award of $5,000 for Named Plaintiff Daaiyah Shabazz from the escrowed funds previously paid by the defendant is approved;

8. ORDERED that the Claims Administrator's reasonable fees of $21,354.02 from the escrowed funds previously paid by the defendant are approved;

9. ORDERED that Employment Horizons is approved as the cy pres recipient;

10. ORDERED that this case shall be dismissed on the merits and with prejudice as to the claims of Named Plaintiff and all Collective and Class Action Members released by the terms of the Settlement Agreement;

11. ORDERED that the Court will retain jurisdiction over the interpretation and implementation of the Settlement Agreement as well as any matters arising out of, or related to, the interpretation or implementation of the Settlement Agreement and of the settlement contemplated thereby.

12. The clerk is DIRECTED to otherwise CLOSE this case.


*/s/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge